08 CV 03327

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NIIT (USA), INC., | ) | *ECF CASE* |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| CENGAGE LEARNING, INC. f/k/a | ) | |
| THOMSON LEARNING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

RECEIVED
APR 03 2008
U.S.D.C. S.D N.Y.
CASHIERS

## COMPLAINT

Plaintiff NIIT (USA), Inc. ("NIIT") files this Complaint against Defendant Cengage Learning, Inc. f/k/a Thomson Learning, Inc. ("Cengage") and shows this Court as follows:

### The Parties, Jurisdiction and Venue

1.      NIIT is a Georgia corporation with its principal place of business located at 1050 Crown Pointe Parkway, Atlanta, Georgia 30338.

2.      Cengage is a Delaware corporation with its principal place of business located at 200 First Stamford Place, 4th Floor, Stamford, Connecticut 06902.   This Court has personal jurisdiction over Cengage, and venue is proper in this Court, pursuant to the contract between the parties that is at issue in this action, which provides that the state and federal courts of New York County, New York shall be the exclusive forum for any dispute arising thereunder, and that the parties submit to personal jurisdiction and venue in this district.

3.      Prior to approximately May, 2007, Cengage was known as Thomson Learning, Inc. ("TLI") and headquartered in Scottsdale, Arizona.  TLI changed its corporate name to Cengage in or about May of 2007 after a portion of its business, unrelated to this action, was spun off and sold to a third-party.

1

3845668.1

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

5.     Cengage may be served with process by delivery of the Summons and a copy of the Complaint to its registered agent, Corporation Service Company, at 50 Weston Street, Hartford, Connecticut 06120.

## Background Facts

6.     NIIT re-alleges and reincorporates the allegations contained in paragraphs 1-5 of the Complaint as if the same were set forth herein *verbatim*.

7.     NIIT is engaged in the business of, *inter alia*, providing knowledge-based solutions to educational and business entities, including development of custom training products.

8.     On or about March 23, 2006, NIIT and Cengage entered into a Master Services Agreement ("MSA"), which generally outlined the terms under which Cengage would thereafter commission NIIT to perform certain projects, and to provide certain services and work product to Cengage in connection therewith (the "Deliverables"), pursuant to Statements of Work ("SOWs") separately executed by NIIT and Cengage and incorporating – among other terms, specifications and particulars unique to each SOW – the terms and provisions of the MSA. A true and correct copy of the MSA is attached as Exhibit A hereto.

9.     Pursuant to the MSA, NIIT and Cengage also entered into that certain SOW executed on or about March 23, 2006, under which NIIT was to perform and provide Deliverables in connection with a project known as Project Expedition for Cengage (the "Project Expedition SOW"). A true and correct copy of the Project Expedition SOW is attached as Exhibit B hereto.

2

10.    The MSA provided, at paragraph 2(b), that if Cengage found a Deliverable to be acceptable, it would give NIIT written notice via email or other means that it had accepted such Deliverable.

11.    The MSA also provided, at paragraph 7(g), that upon expiration or termination of the MSA for any reason, Cengage would pay NIIT for "any Services performed in accordance with the terms hereunder or for any Work Product that it elects to accept" prior to such expiration or termination.

12.    The MSA provided further, at Paragraph 4(a), that Cengage agreed to pay NIIT in accordance with the fee structure specified in the applicable SOW, in this instance, the Project Expedition SOW.

13.    The Project Expedition SOW in turn provided, at Paragraph 4, that "[a]ll services [would] be billed [by NIIT] on a time and materials basis at the rate of $20 per hour worked, not to exceed $735,000 in total."

14.    The Project Expedition SOW further provided that Cengage would reimburse NIIT in full for any pre-approved out-of-pocket expenses that NIIT incurred on Cengage's behalf in the course of its work on Project Expedition.

15.    On or about September 30, 2006, and pursuant to the MSA and the Project Expedition SOW, NIIT sent an invoice for design and development work provided on Project Expedition to Cengage in the amount of $167,280.00 ("Invoice No. 1"). A true and correct copy of Invoice No. 1 is attached as Exhibit C hereto.

16.    On or about October 1, 2006, and pursuant to the MSA and the Project Expedition SOW, NIIT sent a second invoice to Cengage in the amount of $27,000.00 ("Invoice No. 2") for

3

reimbursement for a server license that NIIT purchased on Cengage's behalf in connection with Project Expedition. A true and correct copy of Invoice No. 2 is attached as Exhibit D hereto.

17.     As required in the Project Expedition SOW, Cengage approved in advance, in written correspondence on June 14, 2006, the purchase of the server license on its behalf that is the subject of Invoice No. 2, and was therefore obligated under the Project Expedition SOW to reimburse NIIT in full for that expense. Cengage further promised, in the June 14, 2006 correspondence itself, to reimburse NIIT in the amount of $27,000.00 for the server license and accompanying software. A true and correct copy of the June 14, 2006 correspondence is attached as Exhibit E hereto.

18.     On or about October 31, 2006, and pursuant to the MSA and the Project Expedition SOW, NIIT sent a third invoice to Cengage in the amount of $96,080.00 ("Invoice No. 3") for offshore services performed between October 1, 2006 and October 31, 2006 in connection with Project Expedition. A true and correct copy of Invoice No. 3 is attached as Exhibit F hereto.

19.     Cengage further confirmed, in written correspondence dated on or about November 21, 2006, that all NIIT Deliverables due in connection with Project Expedition had been reviewed and accepted by Cengage. In this correspondence, Cengage even commended NIIT for its "hard work" and "effort" on the project. A true and correct copy of the November 21, 2006 correspondence is attached as Exhibit G hereto.

20.     Notwithstanding the foregoing, and despite repeated demands, Cengage has failed and/or refused to remit any payment to NIIT on Invoice No. 1, Invoice No. 2 or Invoice No. 3 (collectively the "Invoices"), which Invoices are now past due and owing to NIIT in full.

21.     Accordingly, Cengage currently owes NIIT the aggregate sum of $290,360.00 on the Invoices associated with Project Expedition.

4

**Breach of Contract**

22.      NIIT re-alleges and reincorporates the allegations contained in paragraphs 1-21 of the Complaint as if the same were set forth herein *verbatim.*

23.      NIIT has performed all of its obligations under the MSA and the Project Expedition SOW.

24.      Notwithstanding the foregoing provisions of the MSA and the Project Expedition SOW and its obligations thereunder, and despite expressly accepting all of NIIT's services, work product and other Deliverables, as well as pre-approving and committing to reimburse NIIT for the out-of-pocket costs incurred in connection therewith, Cengage has failed and refused entirely, without any legitimate justification, to make payments to NIIT on any of the Invoices, which failure constitutes a breach of the MSA and the Project Expedition SOW.

25.      As a result of its breaches of the MSA and Project Expedition SOW, Cengage is liable to NIIT in the aggregate principal sum of $290,360.00 on the Invoices, plus accrued and accruing pre-judgment interest, costs of suit and attorney's fees as permitted under New York law.

**WHEREFORE**, NIIT respectfully requests that this Court enter judgment in its favor, and against Cengage, and award NIIT relief as follows:

(a)    Compensatory damages in the aggregate principal sum of $290,360.00;

(b)    Pre-judgment interest at the maximum rate allowed by law;

(c)    Expenses of litigation, including reasonable attorney's fees, as permitted under New York law;

(d)    All costs of this action; and

(e)    Such other and further relief as this Court deems just and proper.

Dated: April 3, 2008

| ARNALL GOLDEN GREGORY LLP | RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP |
|---|---|
| By: /s/ Darryl S. Laddin<br>    Darryl S. Laddin (DL-5130)<br>    Frank N. White (Georgia Bar No. 753377)<br>    Jared M. Lina (Georgia Bar No. 191099)<br><br>171 17th Street, N.W.<br>Suite 2100<br>Atlanta, GA 30363-1031<br>404.873.8120 (phone)<br>404.872.8745 (fax)<br><br>Lead Attorneys for Plaintiff NIIT (USA), Inc. | By: _____<br>    Michael P. O'Mullan (MO-6058)<br>500 Fifth Avenue<br>New York, New York 10110<br>Tel (212) 302-6574; Fax (212) 302-6628<br>-and-<br>Headquarters Plaza<br>One Speedwell Avenue<br>Morristown, NJ 07962-1981<br>Tel (973) 538-0800; Fax (973) 538-1984<br><br>Local Counsel for Plaintiff NIIT (USA), Inc. |

# Exhibit A

# MASTER SERVICES AGREEMENT

This Services Agreement (this "Agreement"), dated as of
_03/23/06_____ ("Effective Date"), is made by and between Thomson
Learning Inc., a Delaware corporation with an address of 14624 N. Scottsdale Road, Ste.
300, Scottsdale, AZ 85254 ("TL"), and ___NIIT (USA) Inc._____a
_GEORGIA_____ corporation with an address of 1050 Crown Pointe Parkway,
Floor 5, Atlanta, GA 30338 ("Consultant").

## 1. SERVICES:

Consultant shall perform the services ("Services") described in the Statement of
Work attached hereto as Exhibit A-1 and any additional Statements of Work as
mutually agreed upon by the parties, each of which shall be attached hereto and
incorporated herein. The terms and conditions of this Agreement shall take
precedence over any conflicting terms and conditions in any Statement of Work,
provided that if a particular Statement of Work expressly amends by section a
term of this Agreement, such amendment shall take precedence and be valid for
that particular Statement of Work only. TL may provide the Consultant with
certain content, technology or other materials owned by TL or its affiliates
(collectively "TL Content") including without limitation, as set forth in Exhibit A-
1, which shall be used by the Consultant solely to fulfill its obligations hereunder.

(a) Consultant shall furnish the facilities, equipment, personnel and all other
necessary and related items for the performance of the Services, unless
otherwise specified in the applicable Statement of Work.

(b) Consultant personnel will observe and comply with TL's security
procedures, rules, regulations and policies (as updated from time to time),
and Consultant will use its best efforts to minimize any disruption to TL's
normal business operations at all times.

(c) Upon the request of TL, Consultant shall withdraw any of Consultant's staff
who are, in TL's opinion, unsatisfactory for servicing TL's needs under the
applicable Statement of Work. If any of Consultant's staff is withdrawn for
this reason during the individual's first thirty (30) days on assignment,
Consultant will not charge TL for any Services provided by the withdrawn
individual. Consultant will assign to TL an acceptable replacement as soon
as possible.

Consultant agrees that it shall not outsource or subcontract any Services to any third
party, unless it receives prior written approval from TL. All third party subcontractors
shall agree in writing to be bound by the terms and conditions of this Agreement by
executing an agreement either in the form of Schedule 1 or otherwise acceptable to TL,
and Consultant shall be responsible for all acts, defaults or neglects of such third party

subcontractors, as fully as if they were acts, defaults or neglects of Consultant. Consultant shall provide copies of the executed agreements upon request of TL.

2.    DEVELOPMENT AND DELIVERY:

(a)    To the extent that the Services include the creation of any Work Product, Consultant shall create, develop and deliver to TL the deliverables as set forth in the applicable Statement of Work (the "Deliverables"), on or before the dates specified therein and in the format specified therein. The Deliverables shall conform to the specifications set forth in the Statement of Work and shall be acceptable to TL (acting in its sole discretion) in form and content. The parties agree that time is of the essence. Any failure to meet the schedule set forth in the applicable Statement of Work shall constitute a material breach of this Agreement. For the avoidance of doubt, the term Deliverables includes the Work Product and the Consultant Materials as defined herein.

(b)    Within a reasonable time after the receipt of each Deliverable, TL shall test and/or review such Deliverable in accordance with such procedures, as TL considers suitable. If a Deliverable is acceptable, TL shall give Consultant written notice via email or other means as provided herein that it has accepted such Deliverable. Acceptance of any Deliverable shall not limit TL's right to accept or reject subsequent Deliverables.

(c)    In the event a Deliverable is not acceptable, TL shall return the Deliverable with written notice via email or other means as provided herein of all deficiencies to Consultant for correction or revision within the reasonable time period specified by TL. Within a reasonable time after delivery of a corrected or revised Deliverable, TL shall test and/or review the corrected or revised Deliverable in accordance with such procedures as TL considers suitable. If the Deliverable is acceptable, TL shall give Consultant written notice via email or other means as provided herein that it has accepted the corrected or revised Deliverable. If the Deliverable is not acceptable, the foregoing process shall continue until the Deliverable is accepted or the Statement of Work is terminated. If after two (2) iterations of the above testing procedure, a Deliverable is still not acceptable, TL may, in its discretion, terminate the corresponding Statement of Work or this Agreement without liability or penalty upon written notice to Consultant.

(d)    In the event Consultant uses or incorporates into the Deliverables any third party authoring tools or any other proprietary third party software other than as set forth on Exhibit B-1, Consultant shall notify TL thereof and shall obtain a perpetual license at Consultant's sole expense permitting TL and its affiliates to use such third party software or authoring tools in connection with the Deliverables to the fullest extent of TL's rights

therein. Consultant shall not use any third party software or authoring tools in connection with the Deliverables requiring TL or its affiliates to pay any additional fees without TL's prior written approval. For the avoidance of doubt, the software referred to on Exhibit B-1 hereto shall be considered Consultant Materials.

(e)     TL and its affiliates own and shall retain all of their respective right, title and interest in and to the TL Content. The Consultant shall not, by virtue of this Agreement or by virtue of its access to the TL Content, obtain any rights in or to the TL Content, except the rights specifically granted to the Consultant herein. TL and its affiliates hereby grant to the Consultant a non-exclusive, non-transferable, limited license during the term of this Agreement, to use the TL Content solely in accordance with, and subject to, the terms of this Agreement on behalf of TL.

(f)     Subject to the license granted to TL and its affiliates herein, the Consultant owns and shall retain all right, title and interest in and to the pre-existing content, technology or other materials set forth in Exhibit B-1 (the "Consultant Materials"), existing prior to the Effective Date and used to create the Deliverables.

(g)     The Consultant hereby grants to TL and its affiliates a worldwide, irrevocable, perpetual, non-exclusive license to use, reproduce, modify, publicly perform, publicly display, market, sell, distribute, sub-license, and otherwise exploit and utilize the Consultant Materials in connection with the exercise by TL and its affiliates of their respective ownership rights in and to the Deliverables, and any revisions or modifications thereof, in any and all formats and versions, by any means and in any media, whether now known or hereafter developed. The Consultant will promptly provide TL with a copy of the source code of the Consultant Materials if TL so requests, to enable TL and its affiliates to exercise their rights hereunder. TL agrees that neither TL nor its affiliates will use such Consultant Materials for any purpose not related to the exercise of their respective rights to the Deliverables, as described herein.

3.     WORK PRODUCT; GRANT OF RIGHTS:

Consultant shall promptly and fully disclose to TL all inventions and works of authorship, including improvements, discoveries, ideas, technologies, know-how, work product, concepts, software programs, computer language, programming aids, documentation or any other intellectual property, conceived, developed, originated, fixed or reduced to practice by Consultant in connection with any Services performed by it for TL, exclusive of Consultant Materials (collectively, "Work Product"). Consultant hereby agrees that all Work Product is specially ordered or commissioned by TL on its own behalf or, in the event that TL engages Consultant as a subcontractor, on behalf of its principals, as works

made-for-hire pursuant to 17 U.S.C., Section 201(b) (the Copyright Act), and TL shall own all right, title and interest thereto. To the extent that the Work Product, or any portion thereof, does not vest in TL as a work made-for-hire, Consultant hereby assigns to TL all right, title and interest Consultant may have had, now has, or hereafter may have in and to the Work Product, including without limitation, the copyright rights therein, including any and all renewals, revision, revivals, reversions and extensions thereof, now existing or hereafter created or discovered, together with any and all accrued rights of action (including without limitation the right to sue for past infringements), to have and to hold the same for the full life of each such right in each territory throughout the Universe. Consultant hereby waives any so-called "droit moral" rights, "moral rights of authors" and all other similar rights however denominated throughout the world. Consultant authorizes TL to register the copyright for the Work in TL's name or any other name it designates in any and all countries. Consultant may not use, or allow other to use, the Work Product, except on behalf of TL.

4.     **FEES; AUDIT:**

(a)     In full and complete consideration for the Services and the rights granted herein, TL agrees to pay Consultant in accordance with the fee structure (e.g., fixed price, time and materials, etc.) specified in the applicable Statement of Work. With respect to Services performed on a time and materials basis, Consultant shall send TL periodic invoices as specified in the applicable Statement of Work, and TL shall be responsible for making payment within thirty (30) days following the end of such period. With respect to Services performed on a fixed fee basis, TL shall be responsible for making payment within thirty (30) days following TL's acceptance of the relevant deliverable(s).

(b)     Consultant shall use best efforts to ensure that the prices and provisions for the Services furnished to TL are not, and will not be, less favorable than the prices and provisions offered to any of Consultant's other customers. If Consultant offers lower prices or more favorable provisions to any other customer, then Consultant shall concurrently extend such prices or provisions to TL and TL may accept such prices or provisions. If TL accepts the new prices or provisions, the parties will execute an amendment to reflect the new terms. Any amounts charged to TL in excess of prices charged by Consultant to any other customer for similar services will promptly be refunded or credited to TL by Consultant, at TL's option.

(c)     Consultant shall maintain an itemized log of Services performed for TL, and accurate books of account and records in sufficient detail to properly determine the fees due hereunder. Consultant will keep such books and records for at least two (2) years following the end of the year to which they pertain, and Consultant agrees to make such books and records

available for inspection by TL or its auditors during such period for the purpose of verifying payments due hereunder. Such inspections may be made upon fifteen (15) days prior written notice at reasonable times mutually agreed upon by the parties. If the audit discloses any discrepancy that results in monies being owed by Consultant to TL, Consultant shall make immediate restitution. If the monies owed to TL exceed five percent (5%) of the total amount paid by TL during the period being audited, Consultant shall pay for the cost of the audit. Otherwise, TL will bear all audit expenses.

(d)     If requested, Consultant shall provide TL with monthly project status, performance metrics reports, and other reports, and/or access to its facilities, as may be reasonably requested by TL or as further detailed in the Statements of Work. In addition, Consultant shall participate in status review meetings as set forth in each Statement of Work or as requested by TL (or the applicable Affiliate). TL shall provide Consultant with such reports as the parties shall mutually agreed in order to facilitate Consultant's performance of the Services.

(e)     TL and each affiliated entity signing a Statement of Work hereunder shall have the right to set off any loss, damage, liability or claim which it may have against Consultant against the payment owing to Consultant under (i) the applicable Statement of Work, (ii) any other Statement of Work between Consultant and TL, and (iii) any other separate contract(s) between Consultant and TL.

5.    REPRESENTATIONS AND WARRANTIES:

(a)     Consultant represents and warrants to TL that (i) Consultant has full power and authority to enter into this Agreement and to grant the rights granted hereunder; (ii) any Work Product and Consultant Materials shall be original except for any third party content or technology specifically identified by Consultant in writing and the open source software set forth on Exhibit B-1; (iii) Consultant has or will obtain the written permission of the owners of any third party content or technology that Consultant incorporates into, or uses in connection with, any Work Product or Consultant Materials and as may be necessary for TL's use thereof as contemplated by the relevant Statement of Work, and for TL to have and exercise all of the rights afforded to it in this Agreement; (iv) any Work Product and the Consultant Materials, and TL's use thereof as contemplated by the relevant Statement of Work shall not infringe upon or violate any trademark, trade secret, patent, copyright or other intellectual property or proprietary right of a third party; provided however, that this representation as it relates to the Open Source Code component of the Consultant Materials is made to the best knowledge of Consultant and (v) Consultant shall comply with all applicable laws, rules and regulations in the performance of its obligations hereunder.

(b)     Consultant represents and warrants to TL that all Work Product and Consultant Materials shall perform in accordance with the specifications set forth in the applicable Statement of Work.  In the event a Work Product does not so perform, Consultant shall promptly correct the Work Product to meet such specifications at Consultant's own expense.

(c)     Consultant represents and warrants to TL that all Services shall be performed in a workmanlike manner with professional skill and diligence consistent with the highest industry standards.

(d)     Consultant represents that Work Product supplied to TL under this Agreement is free from harmful code of any description, and Consultant shall not damage, interfere with, degrade the performance of, or otherwise adversely affect TL's computer hardware, networks, systems, programs and/or data files.

(e)     The Consultant represents and warrants to TL that the only "open source" code (as defined by the Open Source Initiative) or "Free" code (as defined by the Free Software Foundation) (collectively, "Open Source Code") in the Deliverables, or that is or will be compiled with or linked to Open Source Code, will be as set forth on Exhibit B-1.  The Consultant further represents and warrants to TL that it shall not include Open Source Code or other similar code in the Deliverables, or create the Deliverables in such a way, or for use with any third party code: (i) that would impose any requirements on how the Deliverables, or any portion thereof, are licensed to third parties, (ii) that would create, or purport to create, obligations for TL with respect to the Deliverables, (iii) that would grant, or purport to grant, to any third party any rights to or immunities under TL's intellectual property or proprietary rights in the Deliverables, or (iv) that would have the effect of requiring that the Deliverables, or any portion thereof (1) be disclosed or distributed in source code form, (2) be licensed for the purpose of making derivative works, (3) be redistributable at no charge, or (4) be licensed under any open source or Free software license or licensing scheme.

(f)     EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

6.     **INDEMNIFICATION; LIMITATION OF LIABILITY:**

(a)     Consultant, at its own expense, will defend, indemnify and hold TL and its subsidiaries and affiliates harmless from and against any and all claims,

actions, demands, liabilities, losses, damages, judgments, settlements, costs and expenses (including reasonable attorneys' fees) (any or all of the foregoing hereinafter referred to as "Losses") insofar as such Losses (or actions in respect thereof) are based on, arise out of, or are related to (i) a breach by Consultant of any representation, warranty, covenant or agreement made by it hereunder or (ii) the gross negligence or willful misconduct of Consultant. In addition to other remedies available to TL and its subsidiaries and affiliates, TL may charge the amount of any such Losses against any sums owed to Consultant under this Agreement.

(b)     TL agrees to (i) promptly notify Consultant of any indemnifiable claim (however, failure of TL to so promptly notify Consultant will not relieve Consultant of its indemnification obligations hereunder, except to the extent that it has been damaged thereby) and (ii) give Consultant the opportunity to defend or negotiate a settlement of any such claim and cooperate to the extent reasonable with Consultant, at Consultant's expense, in defending or settling such claim.

(c)     Consultant shall not have the right, without the written consent of TL or its affected subsidiaries or affiliates, to settle any claim if such settlement (i) contains a stipulation to or admission or acknowledgement of, any liability or wrongdoing on the part of TL or its subsidiaries or affiliates, (ii) involves the incurrence of any costs or expenses on the part of TL or its subsidiaries or affiliates, or (iii) imposes any obligation upon TL or its subsidiaries or affiliates. TL reserves the right for itself and its affected subsidiaries and affiliates, at their own expense, to participate in the defense of any matter subject to indemnification by Consultant.

(d)     EXCEPT WITH RESPECT TO INDEMNIFICATION OBLIGATIONS HEREUNDER AND BREACHES OF SECTIONS 9 AND 10, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO THOSE FOR BUSINESS INTERRUPTION OR LOSS OF PROFITS, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 7.     TERM; TERMINATION:

(a)     This Agreement shall commence on the Effective Date and continue until the earlier of (a) the end of the term, if any, set forth in the last Statement of Work; or (b) termination by either party in accordance with this Agreement ("Term"). Notice of termination of any Statement of Work shall not be considered notice of termination of this Agreement unless expressly stated therein. After the expiration of the term, no new SOW shall be entered into.

(b)    Either party has the right to terminate this Agreement if the other party materially breaches any representation, warranty, covenant or agreement made by it hereunder or otherwise fails to perform any of its material obligations hereunder which breach or failure has not been cured within thirty (30) days after receipt of written notice of default from the non-breaching party (or such additional cure period as the non-breaching party may authorize).

(c)    Either party may immediately terminate this Agreement upon written notice to the other party if the other party has a receiver or similar party appointed for all or substantially all of its property, is declared insolvent by a court of competent jurisdiction, ceases to do business, files a petition in bankruptcy or a petition is filed against it in bankruptcy, becomes the subject of any court or administrative proceeding related to its liquidation or insolvency (whether voluntary or involuntary) which is not dismissed within sixty (60) days, or makes an assignment for the benefit of its creditors.

(d)    Either party has the right to terminate any Statement of Work if the other party materially breaches any term of such Statement of Work, which breach has not been cured within thirty (30) days after receipt of written notice of default from the non-breaching party (or such additional cure period as the non-breaching party may authorize).

(e)    TL may terminate any Statement of Work hereunder for any reason upon forty-five (45) days prior written notice to Consultant.

(f)    TL may immediately terminate this Agreement or any Statement of Work in the event of a change in control of Consultant. For purposes of this Section, change in control shall mean the acquisition by a person not now in control (within the meaning of this definition) of more than twenty percent (20%) of either the voting power or value of the outstanding capital of Consultant or the right to elect at least twenty percent (20%) of the directors of Consultant but shall not include any transaction involving a public offering of Consultant's securities.

(g)    Upon expiration or termination of this Agreement for any reason, (i) Consultant shall promptly return to TL any Confidential Information in its possession or control; (ii) Consultant shall promptly deliver to TL any Work Product or portion thereof that has been created as of the date of termination; and (iii) TL shall pay Consultant for any Services performed in accordance with the terms hereunder or for any Work Product that it elects to accept. The SOW's outstanding shall continue to be serviced in accordance with their terms, and all provisions of this Agreement shall survive termination of this Agreement as applicable to provide services under such SOW. All other rights and obligations of each party hereunder

shall terminate, except the rights and obligations of the parties under Sections 2(c), 3, 6, 7(G & H), 9, 10 and 11 shall survive and remain in effect.

(h)    In the event of termination for any reason, Consultant agrees that if requested by TL, during a six (6) month transition period ("Transition Period"), on a time and materials basis at mutually agreed rates consistent with Consultant's rates current at the time of termination which are (1) authorized in advance by TL, and (2) properly supported by documentation, including but not limited to timesheets, invoices, etc. to: (i) cooperate with TL in effecting the orderly transfer and migration of the Services to another third party as designated by TL or the resumption of the Services by TL upon TL's request, including any and all knowledge gained during the term of this Agreement; (ii) provide access to its personnel; and (iii) continue to perform those Services as requested by TL which may be necessary or useful to effect such transfer. During this Transition Period, CONSULTANT shall answer all reasonable and pertinent verbal or written questions from TL or its representative regarding Services and deliver to TL all reports and documentation relevant to Services in Consultant's possession.

## 8.    RELATIONSHIP MANAGER:

During the term of this Agreement, Thomson and Consultant may, in each Statement of Work, designate an employee with sufficient knowledge and background to act as the primary liaison between Thomson and Consultant (the "Thomson Relationship Manager" or "Consultant Relationship Manager" as the case may be). Each Relationship Manager will have primary operational responsibility for its responsibilities hereunder and will serve as the primary liaison with the other party to the relevant Statement of Work.

## 9.    NON-DISCLOSURE:

"Confidential Information" is defined as any confidential or proprietary information of TL or its affiliates that is disclosed to Consultant, or learned or observed by Consultant in the course of performing its obligations hereunder, including, without limitation, the terms of this Agreement, business and financial information, product specifications, sales and marketing information, and technology. Consultant will hold all Confidential Information in confidence and will not disclose any Confidential Information to third parties nor use any Confidential Information for any purpose other than as required to perform under this Agreement. Consultant agrees to take all appropriate action to ensure the confidentiality and security of the Confidential Information and to treat the Confidential Information with the same degree of care that it uses to protect its own confidential information of like kind and value, but in no case less than a reasonable degree of care. Consultant acknowledges that a breach of this Section may cause irreparable harm to TL or its affiliates and that TL and its affiliates

shall be entitled to seek injunctive or other equitable relief in the case of such breach or threatened breach in addition to any other remedies it may have at law or in equity.

## 10. NON-COMPETE:

Consultant shall not, directly or indirectly, at any time prior to termination of this Agreement assign or involve any employee or consultant who provided Services under a Statement of Work to provide a substantially similar or competitive Deliverable (as provided for in the applicable Statement of Work) to a TL competitor during the term of the applicable Statement of Work and for six (6) months after the termination of the applicable Statement of Work.

## 11. INSURANCE:

(a)     Consultant shall, at its sole cost and expense, procure and maintain throughout the Term:

(i)     Commercial General Liability Insurance – $1,000,000 per occurrence limit and $2,000,000 general aggregate limit;

(ii)    Automobile Public Liability and Property Damage, including coverage for all hired or non-owned automotive equipment used in connection with the insured's operations. - $1,000,000 per occurrence single limit for bodily injury and property damage and $2,000,000 general aggregate limit;

(iii)   Workers Compensation and Employers Liability Insurance – in accordance with current statutory limits;

(iv)    Professional and/or Contractual Liability Insurance – $1,000,000 per occurrence limit and $2,000,000 general aggregate limit.

Consultant agrees to name TL as an additional insured with respect to claims arising from or relating to Consultant's performance hereunder, and shall provide copies of the relevant certificates and documentation to TL, verifying compliance with this Section. The insurance required by this Section shall not be cancelled or materially changed unless and until TL has received, from either Consultant or the relevant insurance carrier, at least thirty (30) days' prior written notice of such cancellation or material change. Consultant shall cause Consultant's insurance carriers to waive subrogation against TL and its shareholders, directors, officers, employees, affiliates and agents in Consultant's insurance policies required by this Section.

## 12. MISCELLANEOUS:

(a)   Publicity.   Consultant shall not publicly use the TL name, trademark or logo in any publicity, promotion, news release, website posting, announcement, client list, marketing materials or other disclosure or otherwise refer to TL in any way in or with the media with respect to this Agreement or the transactions contemplated hereunder, unless Consultant has obtained the prior written consent of TL.

(b)   Choice of Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York without reference to conflict of law principles thereunder. Any dispute arising under this Agreement shall be resolved in the state and federal courts of New York County, New York, and each party hereto waives any objection to venue and hereby submits to the personal jurisdiction of such courts.

(c)   Force Majeure.   Neither party will be liable for any delay or failure in performing its obligations hereunder if caused by a factor beyond such party's reasonable control, including, without limitation, acts of God, acts of terrorism, acts of government, fire or other casualty, provided the affected party makes every effort to promptly resume performance. In the event that the affected party cannot resume performance within thirty (30) days, then the other party may, without penalty or liability, terminate this Agreement upon written notice. Notwithstanding the foregoing, the occurrence of a Force Majeure event does not limit or otherwise affect Consultant's obligation to provide either normal business continuation procedures or any other disaster recovery services as required to be provided by Consultant. As part of the Services, Consultant shall (a) maintain a reasonable and adequate disaster recovery plan ("DRP") for Consultant's facilities, (b) upon TL's request, certify to TL that the DRP are fully operational; and (c) upon discovery by Consultant, immediately provide TL with notice of a disaster and implement the DRP applicable to Consultant's facilities. In the event of a disaster pursuant to this Section, Consultant shall not increase its charges under this Agreement or charge TL additional fees

(d)   Assignment.   Consultant may not assign this Agreement, or any of Consultant's rights or obligations hereunder, without TL's prior written consent.   TL may assign its rights and obligations hereunder without consent of Consultant. All of the provision of this agreement shall be binding upon and inure to the benefit of each party's successors in interest and permitted assigns.   Any attempt to assign this Agreement other than in accordance with this Section shall be null and void.

(e)   The parties understand and agree that Consultant may execute multiple schedules pursuant to this Agreement and that multiple divisions of TL or its TL affiliates may be party to such schedules. The terms set forth in any

Schedule shall be applicable only to Consultant's relationship with the TL division executing such Exhibit and not to Consultant's relationship with any other division.

(f)    Waiver.   The failure by either party to insist upon strict enforcement of any terms and conditions of this Agreement shall not be construed as a waiver of such right or of any other right hereunder.    .

(g)    Remedies Cumulative.   Except as expressly limited herein, the rights and remedies set forth hereunder are cumulative and in addition to any other remedies available at law or in equity.

(h)    Relationship of the Parties.   It is expressly understood that Consultant is providing services to TL under this Agreement as an independent contractor and as such Consultant is fully and solely responsible for complying with all income and other tax laws, rules, and regulations applicable to Consultant individually, and, if Consultant employs others, applicable to Consultant as an employer. TL shall furnish Consultant annually with a copy of IRS form 1099 (statement for recipients of miscellaneous income), the original of which TL shall send to the IRS as required by law. As an independent contractor, Consultant shall not be entitled to, and shall not share in, any benefits which TL does or may grant to its employees, including, but not limited to, health and life insurance, sick leave, retirement plans, paid time off such as vacation and holiday pay. The payments set forth in this Agreement are the complete and agreed upon compensation.

(i)    Headings.   The headings of the various sections of this Agreement have been inserted only for purposes of convenience; such headings are not part of this Agreement and shall not be deemed, in any manner, to modify, enlarge or restrict any of the provisions of this Agreement.

(j)    Notices.   Any and all notices and other communications to either party hereunder shall be in writing and deemed delivered (i) upon receipt if by hand, email (where expressly provided herein) or overnight courier and (ii) three (3) days after mailing by first class, certified mail, postage prepaid, return receipt requested, to the addresses set forth on the first page hereof or to such other address for a party as shall be specified by like notice.

(k)    Severability.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect.

(l)    Entire Agreement.   This Agreement and any Exhibits, addenda, amendments constitute the entire understanding between the parties with

respect to the subject matter hereof. There are no other understandings, agreements, representations or warranties relied upon by either party with respect to the subject matter herein, which are not included herein. This Agreement may be modified only in writing signed by both parties. Consultant's invoices may be submitted for administrative purposes only, but the terms and conditions contained therein shall be of no force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

CONSULTANT – NIIT – (USA), Inc.

Name: P.R Subramanian
Title: Financial Controller
Email: PRS@niiLeom

THOMSON LEARNING INC.

Name: Pat Call
Title: VP Thomson Learning Technology COE
Email: Pat.Call@Thomson.com

# Exhibit B

## PROJECT EXPEDITION
### Statement of Work

This Statement of Work ("SOW") by and between Thomson Learning ("TL") and NIIT (USA), Inc. ("Consultant") is subject to and incorporates by reference the provisions of a Master Services Agreement, dated ___3-23-06_____ ("Agreement"). Any capitalized term not defined herein shall have the meaning given it in the Agreement.

This SOW is effective as of the last date found at the end of this SOW ("Effective Date"). The term of this SOW shall continue until Acceptance, or earlier termination by either party pursuant to the Master Services Agreement.

1. **Description of Consultant Services**

The scope of this Statement of Work includes

1. Knowledge transfer on the product architecture and design from TL to NIIT team
2. NIIT to understand the requirement and prepare design document for the required functionality. (The list of modules to be developed are given in Annexure – A). Note: The functional requirements are defined in the Project Expedition Engineering Requirements Documents (ERD) and High level Design documents (HLDs).
3. NIIT to setup the development environment at NIIT's offshore development center in India.
4. NIIT to setup the required connectivity from NIIT offshore development center to TL development environment.
5. NIIT to design the required functionality in accordance with the project requirements as defined in the ERD and HLD.
6. NIIT to provide design documentation (LLD) for review. TL will review and either comment or approve the design prior to coding commencement.
7. NIIT to develop the required functionality in accordance with agreed design documents (LLD).
8. NIIT to work with TL and to integrate the developed modules into the Project Expedition system.
9. NIIT will conduct a User acceptance testing with TL following integration.
10. NIIT to send the test cases that will be used for acceptance testing, TL to review and accept test cases.
11. NIIT to deliver the developed/changed programs to TL using agreed method (check in to TL CVS repository).
12. TL to conduct Acceptance testing of delivered software. NIIT to fix any defects reported by TL.
13. Warranty: Correction of defects (bugs) reported starting from the beginning of acceptance testing and continuing for a period of Twelve (12) months. Warranty deliverables are described in detail in Annexure D.
14. NIIT will create release documentation for the modules created by NIIT.

15. NIIT will create technical and help documentation for all the modules for the project. The list of these modules and the scope of the help documentation is mentioned in Annexure B. The help documentation will comprise the following:
    a. User guides
    b. Feature Guides
    c. Online help
16. The project plan for the deliverables is attached as Annexure C
17. Software to be purchased by NIIT for the development will be reimbursed separately by TL. These licenses will be transferable to TL.
18. NETg will be localizing the strings; NIIT will apply and update these changes.
19. NIIT will fix all bugs found in the code. NIIT will make its best efforts to close all the reported problems in the earliest possible time. Critical and Major problems will be closed within next working day, while Minor problems will be closed within 2 working days

## 2. Deliverables

Modules to be developed by NIIT for Project Expedition as defined by the ERDs are:

1. Browse
2. Search
3. Shared functions.
4. Reference Shelf
5. Entrance Page
6. Personal Profile
7. Collaboration
8. Notebook
9. Recommendations
10. Annotation
11. Royalty Tracking
12. Reporting
13. Content Viewer
14. Administration
    a. User Mgmt
    b. Collection Management
    c. Content Management
    d. Entitlements
    e. Account Management
    f. Reporting
    g. Manage Client
15. LMS Integration
16. Internal Service & Framework
    a. Branding & Localization/Help & Tool Tips
    b. Audit Trails

c. Portal Skimming

For twelve months following the release of any Deliverable by NETg, NIIT warrants the code and shall correct promptly any reproducible error in said Deliverable upon NIIT's receipt of written notice from NETg at no additional cost to NETg.

Project Plan

The detailed project plan is attached as Appendix C.
A high level deliverable plan is attached:

| | | |
|---|---|---|
| Browse | 19-May | 10-Jul |
| Search | 7-Jul | 12-Jul |
| Shared functions | 14-Jul | 28-Jul |
| Reference Shelf | 10-Jul | 10-Jul |
| Entrance Page | 12-Jun | 10-Jul |
| Personal Profile | 12-Jul | 24-Jul |
| Collaboration | 9-Jun | 29-Jun |
| Notebook | 7-Jul | 12-Jul |
| Recommendations | 7-Jul | 12-Jul |
| Annotation | 7-Jul | 12-Jul |
| Reporting (includes Royalty Tracking) | 15-Jul | 18-Aug |
| Branding & Localization | 12-Jul | 28-Jul |
| Audit Trails | 12-Jul | 7-Jul |
| Administration | 31-Jul | 18-Aug |
| LMS Integration | 12-Jul | 28-Jul |
| | | |
| System Testing | - | 9-Oct |
| Integration Testing | - | 8-Sep |
| Acceptance Testing | - | 6-Oct |

3. Acceptance of Deliverables

All Deliverables will be reviewed for conformance to the requirements documentation by the TL team and are subject to Acceptance (as defined in, and in accordance with the terms of, the Master Services Agreement). All Acceptance must be in writing, signed by the TL Technical Lead and QA Director. If NIIT fails to deliver according to the specifications and milestone dates set forth in this SOW, NIIT will refund any monies paid for said work. If monies have not been paid, TL is not obligated to pay NIIT for those milestones that NIIT fails to deliver and TL Accept. If NIIT fails to deliver by the July 31, 2006 deadline for code complete and the October 6th deadline for Acceptance testing, NIIT may at NETg's sole discretion be penalized up to 10% of the total fees for the project. NIIT further warrants that the Deliverables shall function in accordance with their specifications for not less than twelve months following release by NETg of such deliverable and NIIT further covenants to repair or replace at no additional charge any

Deliverable that fails to function in accordance with its specifications for at least such twelve month period.

## 4. Fees and Expenses

The cost for this project will not exceed $735,000. This cost is based on the cost breakdown provided in the following table. All Services will be billed on a time and materials basis at the rate of $20 per hour worked, not to exceed $735,000 in total.

| Project Deliverables | Cost |
| --- | --- |
| Project Expedition – Design, Development & Testing | $735,000 |
| User documentation & guides | $48,000 |
| TOTAL | $783,000 |
| Optional Warranty after Initial 12 month Warranty Period | $105,600 |

TL will pay travel expenses if on-site work is required in TL's opinion, including food, lodging, and transportation, but will not pay Consultant for time spent traveling. Each individual expense shall be supported by satisfactory documentation and shall be subject to TL's prior written approval, all in accordance with TL's then-standard expense reimbursement policies. Thomson must authorize on-site work in writing prior to the commencement of travel. Thomson must authorize any expenses in addition to labor cost in writing. If authorization is not received, the vendor will not be reimbursed for the expense.

## 5. Payment, Including Frequency of Invoices by Consultant.

The Consultant will submit invoices *MONTHLY* to the Project Coordinator with supporting documentation to substantiate the hours and expenses reported. Timesheet templates shall be provided by the Program Manager to be completed by the Consultant. The Consultant shall submit the timesheets to the Thomson Project Manager each Monday documenting the hours charged for the previous week (Monday through Sunday work week). Billable hours shall be reported in increments of 15 minutes on the timesheets. The Thomson Project Manager shall have sole discretion in determining if the timesheets are accurate, or the number of hours reported by Consultant reasonably approximates the appropriate number of hours of development for the given task.

## 6. Change Control

This SOW may not be modified or amended except via a written change order (a "Change Order") signed by the Business Contacts of both parties, provided that TL may, at any time, upon written notice to Consultant, revise the Services or Deliverables in a manner which does not materially change the scope of the Services or Deliverables, and which does not require substantial labor hours to implement, and no additional fees shall

arise therefrom. Outside of that scenario, if TL requests, or Consultant recommends, changes to the SOW, including without limitation material changes to the Services or Deliverables, or material changes to the performance dates, within five (5) business days of such request or recommendation, Consultant will provide TL, at no additional cost, with a written proposal (the "Change Order Proposal") setting forth, in good faith, (a) a description of the proposed change(s), (b) impact on price (if any), and (c) impact on project schedule. TL may, at its sole discretion, accept or reject the Change Order Proposal. Unless otherwise requested in writing by TL, Consultant shall continue performing the Services and providing the Deliverables in accordance with the pre-change SOW unless and until a Change Order is executed. A Change Order Proposal will be considered rejected if TL does not respond to the proposal within ten (10) business days. If accepted, the Change Order Proposal will become effective as a Change Order only upon execution by both parties, and Consultant shall perform the modified Services and provide the applicable Deliverables subject to such Change Order, in accordance with the terms and conditions of the Master Services Agreement and the revised SOW. This SOW shall be deemed revised accordingly.

7. TL Content (content, technology or other materials used by Consultant to fulfill obligations under SOW):

*n/a*

8. Consultant Materials (preexisting content, technology, software, tools or other materials)::

*n/a*

9. Relationship Managers:

Consultant:
SAILESH LALLA
NIIT (USA), INC.
1050 CROWN POINTE PKWY, #500
ATLANTA, GA 30338

Thomson Learning Technical Lead:

*Bill White*

Thomson Learning

14624 N. Scottsdale Rd., #300

Scottsdale, AZ 85254

480-315-4704


Thomson Learning Project Manager

NIIT PE SOW 7-26-06.doc

5

Jonna Anderson

Thomson Learning

14624 N. Scottsdale Rd., #300

Scottsdale, AZ 85254

480-315-4706


Thomson Learning Project Coordinator

Tammy Wallace

Thomson Learning

14624 N. Scottsdale Rd., #300

Scottsdale, AZ 85254

480-315-4085

QA Director
Luke Hanagan
Tammy Wallace

Thomson Learning

14624 N. Scottsdale Rd., #300

Scottsdale, AZ 85254

480-315-4243

Luke.hanagan@thomson.com

### 10. Miscellaneous

Execution by Counterparts/Facsimile. This SOW may be executed and delivered in counterparts by facsimile, each of which so executed and delivered counterpart is original, and such counterparts, together, shall constitute but the same instrument. Each of the parties hereto agrees to additionally execute, and deliver, original copies of this agreement circulated subsequent to its initial execution and delivery by facsimile

NIIT PE SOW 7-26-06.doc

6

JUL-27-2006 09:29 FROM:                    TO:630 778 4681        P.007/007

**IN WITNESS WHEREOF**, the parties hereto have caused this Statement of Work to be effective as of the day, month and year first written above.

Thomson Learning:

By: _____
Name: PATRICK J. CALL
Title: VP
Date: 7/26/06

NIIT (USA), INC.

By: _____
Name: P. R. Subramaniam
Title: Chief Financial Officer
Date: 8/18/06.

TL:

By: _____
Name: _____
Title: _____
Date: _____

TGR:

By: _____
Name: _____
Title: _____
Date: _____

## Annexure: A

Modules to be developed by NIIT for Project Expedition

1. Browse
2. Search
3. Shared functions
4. Reference Shelf
5. Entrance Page
6. Personal Profile
7. Collaboration
8. Notebook
9. Recommendations
10. Annotation
11. Royalty Tracking
12. Reporting
13. Administration
    a) User Mgmt
    b) Collection Management
    c) Content Management
    d) Entitlements
    e) Account Management
    f) Reporting
    g) Manage Client
14. LMS Integration
15. Internal Service & Framework: Branding & Localization
16. Internal Service & Framework: Audit Trails

# Exhibit C

NIIT (USA) Inc
1050 Crown Pointe Parkway Floor 5 Atlanta, GA 30338
Tel Number: 1(770) 5519494  Fax Number: 1(770) 5519229

Case 1:08-cv-03327-JES  Document 1-2   Filed 04/03/2008   Page 2 of   **NIIT**

## INVOICE

| | |
|---|---|
| Invoice Number: | 26242136 |
| Invoice Date: | 09/30/2006 |
| Customer Number: | 120138 |
| Customer P.O. Number: | SOW # Knowledge Tran |
| Customer P.O. Date: | 06/22/2006 |
| Sales Order Number: | 1190672 |
| Sales Order Date: | 03/25/2006 |

**Thomson Learning Inc.**
85254
14624 N. Scottsdale Road, Ste. 300
Scottsdale, Arizona 85254
Attn. Kathy Dugas

| Item | Description/Milestone | Quantity | Unit | Price (USD) | Value (USD) |
|------|----------------------|----------|------|-------------|-------------|
| 2 | Towards design & development of Project expedition | 1 | EA | 167,280.00 | 167,280.00 |

| | |
|---|---|
| Net Payable | 167,280.00 |

Amount in Words: USD One hundred sixty-seven thousand two hundred eighty Point zero Only.

Remarks:

Terms & Conditions:
1. This invoice is subject to the terms and conditions governing the Purchase Order/Contract.
2. Please remit payments to: Accounts Receivable Department, NIIT (USA) Inc
3. Payments should be made latest by 10/30/2006.

# Exhibit D

NIIT (USA) Inc
1050 Crown Pointe Parkway Floor 5 Atlanta, GA 30338
Tel Number: 1(770) 5519494  Fax Number: 1(770) 5519229

# NIIT

**INVOICE**

Thomson Learning Inc.
85254
14624 N. Scottsdale Road, Ste. 300
Scottsdale, Arizona 85254
Attn. Kathy Dugas

| | |
|---|---|
| Invoice Number: | 26242776 |
| Invoice Date: | 10/01/2006 |
| Customer Number: | 120138 |
| Customer P.O. Number: | SOW # Knowledge Tran |
| Customer P.O. Date: | 06/22/2006 |
| Sales Order Number: | 1190672 |
| Sales Order Date: | 03/25/2006 |

| Item | Description/Milestone | Quantity | Unit | Price (USD) | Value (USD) |
|------|----------------------|----------|------|-------------|-------------|
| 4 | Towards cost of jasper decisions server license procured for Project Expenditure. | 1 | EA | 27,000.00 | 27,000.00 |

| | |
|---|---|
| Net Payable | 27,000.00 |

**Amount in Words: USD Twenty-seven thousand Point zero Only.**

Remarks:

Terms & Conditions:
1. This invoice is subject to the terms and conditions governing the Purchase Order/Contract.
2. Please remit payments to: Accounts Receivable Department, NIIT (USA) Inc
3. Payments should be made latest by 10/31/2006.

Registered Office:1050 Crown Pointe Parkway Floor 5 Atlanta, GA 30338

# Exhibit E

-----Original Message-----
From: Wood, Joseph R (NETg)
Sent: Wed, June 14, 2006 12:55 PM
To: McMath, Scott (NETg); 'saileshl@niit.com'
Subject: RE: jasper license


Sailesh,

Per our call a few minutes ago, please go ahead with the purchase.  We will
reimburse cost approved for $27,000 for the software, single license and for
support.  Please ensure the license and software is transferable to NETg once the
project is complete.

Thanks,

Joe

----- Original Message -----

From: Sailesh Lalla <Saileshl@niit.com>
To: McMath, Scott (NETg)
Cc: Dugas, Kathy (TL Tech Sv)
Sent: Wed Jun 14 08:31:26 2006
Subject: FW: jasper license

Scott, Kathy

We urgently need your approval for purchasing the Jasper Decision Server...

Sailesh

Sailesh Lalla

NIIT (USA), Inc.

Work: 770-290-6031, Cell: 678-642-1215; Fax: 770-551-9229

www.niit.com/ksb <http://www.niit.com/ksb>

------------------------------------------------

From: Himanshu Chawla
Sent: Wednesday, June 14, 2006 2:25 AM
To: Sailesh Lalla
Subject: jasper license

Hi Sailesh,

We are hitting a roadblock on the license issue - can you please call up Scott and
get a go ahead.

------------------------------------------------

Thanks & Regards

Himanshu Chawla

Business Analyst

Knowledge Solutions Business

NIIT Ltd.

C - 125, Okhla Phase 1, New Delhi 110020

Work: +91 11 4140 7180

Cell: +91 98183 44275

# Exhibit F

**NIIT**

NIIT (USA) Inc
1050 Crown Pointe Parkway Floor 5 Atlanta, GA 30338
Tel Number: 1(770) 5519494  Fax Number: 1(770) 5519229

**Thomson Learning Inc.**
85254
14624 N. Scottsdale Road, Ste. 300
Scottsdale, Arizona 85254
Attn. Kathy Dugas

## INVOICE

| | |
|---|---|
| Invoice Number: | 26243506 |
| Invoice Date: | 10/31/2006 |
| Customer Number: | 120138 |
| Customer P.O. Number: | SOW # Knowledge Tran |
| Customer P.O. Date: | 06/22/2006 |
| Sales Order Number: | 1190672 |
| Sales Order Date: | 03/25/2006 |

| Item | Description/Milestone | Quantity | Unit | Price (USD) | Value (USD) |
|---|---|---|---|---|---|
| 5 | For the services of NIIT expedition team performed offshore between October 1st and October 31st 2006 (Total of 4804 hours @ $20/hr) | 4,804 | EA | 20.00 | 96,080.00 |

| | |
|---|---|
| **Net Payable** | **96,080.00** |

Amount in Words: USD Ninety-six thousand eighty Point zero Only.

Remarks:

Terms & Conditions:
1. This invoice is subject to the terms and conditions governing the Purchase Order/Contract.
2. Please remit payments to: Accounts Receivable Department, NIIT (USA) Inc
3. Payments should be made latest by 11/30/2006.

Registered Office:1050 Crown Pointe Parkway Floor 5 Atlanta, GA 30338

# Exhibit G

Michelle Chesley

| | |
|---|---|
| **From:** | kathy.dugas@thomson.com |
| **Sent:** | Tuesday, November 21, 2006 11:42 AM |
| **To:** | Deepti Kohli |
| **Cc:** | john.aldea@thomson.com; ArifA@NIIT.com; Raman Chawla; Hemant Saxena; Hemant Singh; Bill.P.White@thomson.com; Akhlesh Agarwal; Joe.Wood@thomson.com; Scott.Richardson@thomson.com |
| **Subject:** | RE: Project Expedition Wrap Up Documents |

Deepti,
We have reviewed the deliverables NIIT sent and accepted them.  There is no further work
needed from NIIT.  Thank you very much for all of the hard work NIIT has done on this
project.  We appreciate your effort.
Thanks,
Kathy

-----Original Message-----
From: Deepti Kohli [mailto:Deepti.Kohli@NIIT.com]
Sent: Tuesday, November 21, 2006 3:20 AM
To: Dugas, Kathy (TL Tech Sv)
Cc: Aldea, John (NETg); Arif Ali; Raman Chawla; Hemant Saxena; Hemant Singh; White, Bill
(TL Tech Sv); Akhlesh Agarwal
Subject: RE: Project Expedition Wrap Up Documents

Hi Kathy,

Since we have not got any feedback on these deliverables, I am assuming that these have
been accepted by Thomson team and hence the project can be closed.

Please confirm.

Regards,
Deepti

-----Original Message-----
From: Deepti Kohli
Sent: Tuesday, November 14, 2006 5:53 PM
To: 'kathy.dugas@thomson.com '
Cc: 'john.aldea@thomson.com '; Arif Ali; Raman Chawla; Hemant Saxena; Hemant Singh
Subject: Project Expedition Wrap Up Documents

Hi Kathy,

*Please find attached the "Report Description document".

*Latest code has been checked into SVN.

*We have completed java docs for the service and dao layer and have also
initiated code review for them. The jupiter code review file names are:

-expedition-services_JavaDocComments_COE_Review1
-expedition-daos_JavaDocComments_COE_Review1

*Also, we have sent you latest LLDs with Velocity stack changes in the
email
with subject "Latest LLDs Set : With the current Tech Stack details" on
9th
Nov 06. I am also attaching them with is email for your ready reference.

With these set of deliverables, we have finished the wrap up activities.
Please acknowledge the receipt of this mail and let us know your
feedback by

16th Nov 06.

Regards,
Deepti

--------------------------------------------------------------------

DISCLAIMER

This email and any files transmitted with it are confidential and are
solely for the use of the individual or entity to which it is addressed.
Any use, distribution, copying or disclosure by any other person is
strictly prohibited. If you receive this transmission in error, please
notify the sender by reply email and then destroy the message. Opinions,
conclusions and other information in this message that do not relate to
official business of the company shall be understood to be neither given
nor endorsed by NIIT Ltd. or NIIT Technologies Ltd. Any information
contained in this email, when addressed to Clients is subject to the
terms and conditions in governing client contract.